# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# NEWNAN DIVISION

| | |
|---|---|
| EMORY L. RICKERSON,<br><br>                Plaintiff,<br><br>v.<br><br>RODNEY SCOTT JETER,<br>individually,<br><br>                Defendant. | CIVIL ACTION FILE NO.:<br>_____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** Plaintiff **Emory L. Rickerson** ("Rickerson" or "Plaintiff") and files this civil action for monetary damages against **Rodney Scott Jeter** ("Jeter"), as follows:

### INTRODUCTION

Emory L. Rickerson witnessed Rebecca Buchanan lose control of her car on a rural highway. Ms. Buchanan's car hit a concrete culvert, rolled over twice, and came to rest beside the road. Rickerson, a retired firefighter and first responder, stopped his car and ran to Ms. Buchanan's aid. Other people stopped too. With their help, Rickerson opened the jammed passenger door and cleared Ms. Buchanan's airway. He gave instructions to two other people who were helping him stabilize her

neck and keep Ms. Buchanan's airway clear until paramedics arrived. With their help, Rickerson saved Ms. Buchanan's life.

Rodney Jeter, a Georgia State Patrol Officer, happened upon the scene on his way home from work. He was off duty. He was not in uniform. He did not identify himself as a police officer. He did not attempt to investigate the scene, direct traffic or aid Ms. Buchanan. His only affirmative act was to arrest Rickerson without probable cause and in retaliation for criticizing Jeter's competence.

Rickerson now seeks to hold Jeter accountable in this civil rights action. Rickerson alleges that Jeter, in his individual capacity as a law enforcement officer employed by the Georgia State Patrol ("GSP"), violated his First and Fourth Amendment rights when he unlawfully detained and arrested him without probable cause, and subjected him to prosecution based upon fabricated evidence and in retaliation for his criticism of Jeter's actions at the scene.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Rickerson's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue in this Court is proper under 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims arose in this district and division, and the Defendant resides in the district and division.

## PARTIES

3. Plaintiff Emory L. Rickerson is a United States citizen and resident of Georgia.

4. Defendant Rodney Scott Jeter is sued in his individual capacity. Jeter may be personally served with the Complaint and summons at his place of employment, Georgia State Patrol – Post 2 (LaGrange), 1659 Lafayette Parkway, LaGrange, Georgia 30241.

5. At all times relevant to this action, Jeter was acting under color of state law and within the scope of his discretionary functions as a duly sworn, certified law enforcement officer employed by GSP.

## FACTUAL ALLEGATIONS

6. Mr. Rickerson was born and raised in Thomaston, Georgia.

7. He worked for the City of Griffin's Fire Department for thirty years. He held the rank of Battalion Chief when he retired in 2012.

8. Mr. Rickerson was certified as a first responder in the 1990s. As a first responder, Mr. Rickerson was trained to render first aid to persons in life threatening situations, including persons injured in motor vehicle accidents.

9. At the time of this incident, Mr. Rickerson had decades of experience as a first responder, including responding to scenes of car accidents and rendering first aid to persons injured in those accidents.

10. Mr. Rickerson also had decades of experience extracting persons from cars and trucks involved in accidents.

11. At the time of this incident, Defendant Jeter had been employed as a law enforcement officer by the GSP for 17 years.

12. Jeter may have worked as a firefighter before joining GSP and may have held a paramedic certification.

13. On October 10, 2017 at approximately 4:50 p.m., Rebecca Buchanan was driving a 2006 Saturn Ion on Highway 109 East near the intersection with Walker Road in Pike County. She was traveling alone.

14. Ms. Buchanan crossed the center line, overcorrected and lost control of her car. The car hit a concrete culvert, rolled over twice and came to rest on the shoulder of the westbound lane of travel.

15. Emily Meadows ("Ms. Meadows") was driving behind Ms. Buchanan. She witnessed her lose control of her van and immediately stopped to render aid.

16. Christie Rodriquez ("Ms. Rodriguez") approached the scene just as the accident occurred. She stopped to render aid.

17. Rickerson was traveling towards Ms. Buchanan. He witnessed her lose control of her car.

18. Rickerson drove past the accident site, turned around, and stopped to render aid.

19. Rickerson left his truck in the Eastbound lane of travel with his emergency lights on. His keys were in the truck.

20. Rickerson left his truck running with the emergency lights on in the eastbound lane of a two lane highway for a reason: He was alerting oncoming traffic that a serious accident had occurred so drivers would slow down and proceed with caution.

21. Rickerson ran over to Ms. Buchanan's car. He quickly determined that all four doors were jammed shut because the roof had partially collapsed.

22. Ms. Buchanan trapped inside. Her head was jammed face-first into the passenger seat. Her shoulders were in an unnatural position.

23. The passenger window was shattered. Rickerson reached through the open window frame and felt for a pulse. Ms. Buchanan was unresponsive and was not breathing.

24. Meanwhile, T.C. Minick called 9-1-1 and reported the accident at 4:50:57 p.m. He related that the driver involved in the accident was trapped in her car and she was not breathing.

25. Seconds later, Rickerson, who had left his cell phone in his truck, borrowed a phone and called 9-1-1. He identified himself and described the scene. He told the 9-1-1 operator that the driver was trapped in her car, that she was extremely heavy and was unresponsive and not breathing.

26. The 9-1-1 operator dispatched the Fire and Rescue department and relayed all the information Rickerson gave her.

27. Rickerson turned his attention back to Ms. Buchanan.

28. Ms. Meadows, Ms. Rodriquez and a man who had stopped were all ready to help and, since Rickerson had been a first responder, they looked to him to devise a plan.

29. Rickerson rotated her shoulders and head just enough to see her face so that he could try to open her airway.

30. As he repositioned Ms. Buchanan's head open her airway, Rickerson saw blood bubbling up through her mouth.

31. Rickerson used Ms. Buchanan's shirt to clear the blood.

32. A few seconds later, Ms. Buchanan breathed but still had blood in her mouth.

33. After a couple of minutes, Ms. Buchanan breathed for the first time. She breathed again a few seconds later.

34. Having successfully established an airway, it was life-critical to maintain it.

35. Rickerson asked Ms. Meadows and the man standing nearby to help him keep Ms. Buchanan's head and shoulders still, so that her airway remained open.

36. One person held squatted down and held her head, while the other person held her shoulders. Rickerson was between them, checking Ms. Buchanan's pulse, keeping her airway clear and offering advice and encouragement to Ms. Meadows and the man who was helping them.

37. While Rickerson, Ms. Meadows and the man helping them were busy trying to keep Ms. Buchanan alive, Defendant Jeter happened upon the the scene.

38. Jeter was off-duty.

39. He was not in uniform. He was wearing black pants, a black tee-shirt and a black cap.

40. Jeter saw that Rickerson, Ms. Buchanan and the man were actively involved in rendering emergency care to Ms. Buchanan.

41. Jeter did not come over to assist them.

42. Jeter did not ask if they needed any help.

43. Jeter never attempted to offer any emergency care to Ms. Buchanan.

44. Jeter did not identify himself as a GSP officer and take control of the scene.

45. Someone told Jeter that Ms. Buchanan was unresponsive and struggling to breathe.

46. Someone told Jeter that Rickerson was a retired first responder and was rendering emergency care to Ms. Buchanan.

47. Jeter asked who owned the white truck parked in the Eastbound lane.

48. Rickerson did not hear Jeter.

49. Ms. Meadows heard Jeter and told him that the truck belonged to Rickerson.

50. Jeter told Rickerson to move his truck.

51. Rickerson did not know who Jeter was and told him that he could not leave his patient.

52. Jeter appeared to get angry and asked Rickerson to move his truck again.

53. The man helping Rickerson turned to Jeter and said, "why don't you leave this man alone, he just saved this woman's life."

54. Rickerson repeated that he could not leave his patient but let Ms. Meadows move his truck.

55. Ms. Meadows immediately got up and moved the truck.

56. Ms. Meadows moved the truck moments after Jeter first asked Rickerson to move it.

57. When Jeter asked Rickerson to move his truck, there were no law enforcement cars, fire trucks, ambulances or emergency medical vehicles approaching the scene in the eastbound lane of travel.

58. Rickerson's truck did not impede any official vehicle from accessing the scene.

59. When Jeter asked Rickerson to move his truck, Jeter was not directing traffic, investigating the accident, interviewing witnesses, or offering medical aid to a critically ill woman, he was a bystander serving no useful purpose.

60. Rickerson was justified in refusing to leave a critically ill patient and move his truck because he was actively involved in rendering emergency care to Ms. Buchanan, who had suffered life-threatening injuries in an automobile accident.

61. When Jeter asked Rickerson to move his truck, he knew that Rickerson was rendering emergency care at the scene of an accident to a victim with life-threatening injuries.

62. Jeter did not arrest Rickerson when he refused to leave Ms. Buchanan's side.

63. Jeter remained a bystander on the scene.

64. Jeter only affirmative action was to call 9-1-1 approximately 5 minutes after the accident. He did not tell the 9-1-1 operator anything she did not already

know from previous callers, particularly Rickerson, who had described Ms. Buchanan's condition.

65. Rickerson remained actively involved in rendering aid to Ms. Buchanan until the EMTs arrived on the scene.

66. The EMTs recognized Rickerson when they arrived on the scene. The EMTs asked Rickerson, "what do you have?"

67. Rickerson explained Ms. Buchanan's conditions.

68. One of the EMTs told Rickerson to "hold what you've got."

69. One of the EMTs brought Rickerson a pair of gloves.

70. The EMTs brought a back board over from the ambulance and positioned themselves around Ms. Buchanan.

71. The EMTs asked Rickerson to "call it."

72. Rickerson counted out loud, "1, 2, 3" and helped the EMTs lift Ms. Buchanan on to the back board and into the ambulance.

73. Several Pike County Sheriff's department officers arrived on the scene and established control over the accident site.

74. While Rickerson was busy helping the EMTs load Ms. Buchanan on to the back board and into the ambulance, Jeter spoke to the Pike County officers. He told them that Rickerson would be their best witness to the accident.

75. He told them, "I really had to restrain myself from arresting him" or words to that effect. He asked if the Pike County officers knew Rickerson.

76. One of the Pike County officers said they had "problems before" with Rickerson. The officer said, "He thinks he knows everything," or words to that effect.

77. The Pike County officers began investigating the accident and interviewing witnesses.

78. Jeter did not participate in the investigation.

79. Jeter was not performing any law enforcement functions; he was just standing around.

80. Rickerson finished rendering emergency aid and assisting the EMT once Ms. Buchanan was loaded into the ambulance.

81. Jeter did not arrest Rickerson after he was finished helping the EMTs.

82. Jeter called Rickerson over to speak with him.

83. Jeter did not call Rickerson over to interview him about the accident; instead, he told Rickerson he was a Trooper and had prior experience as a first responder and demanded to know why Rickerson had not immediately moved his truck when Jeter asked him to do so.

84. Rickerson replied that he had no idea who Jeter was and, as a first responder rendering emergency aid to a patient in critical condition, he had a duty to remain with his patient justifying his decision to let Ms. Meadows, who did not have training as a first responder, move the truck instead.

85. Rickerson criticized Jeter, telling him that if he was a law enforcement officer, he should have shown more concern for Ms. Buchanan's well-being.

86. Jeter was agitated and angry that Rickerson was not showing sufficient deference to him.

87. A Pike County officer came over to speak to Rickerson. He asked Rickerson to describe the accident.

88. Rickerson gave a full statement to the officer.

89. Jeter listened to Rickerson's statement.

90. When Rickerson was finished, Jeter launched into his narrative about his experience and told Rickerson that he should have moved his truck.

91. Rickerson told Jeter that he was done listening to him. Rickerson criticized Jeter's conduct on the scene, especially his failure to offer any assistance to Ms. Buchanan and his irrational obsession with Rickerson's decision to remain with Ms. Buchanan and let someone else move his car. Rickerson told

Jeter he had family in law enforcement and Jeter was a disgrace to the profession.

92. Within moments of Rickerson's verbal criticism, Jeter arrested him.

93. Jeter purportedly arrested Rickerson for conduct that occurred at least thirty minutes earlier, despite having affirmatively declined to arrest Rickerson prior to his verbal criticism of Jeter's conduct on the scene.

94. Under the totality of the circumstances, Jeter knew the following facts when he arrested Rickerson: (a) Rickerson was a retired first responder who had been rendering emergency aid to an accident victim when he asked him to move his truck; (b) Jeter was not in uniform and had not identified himself as a law enforcement officer before he asked Rickerson to move the truck; (c) Rickerson had calmly told Jeter he could not leave Ms. Buchanan because he was rendering emergency aid to her; (d) Rickerson's truck was not preventing any emergency vehicles from accessing the scene; and (e) Rickerson let Ms. Meadows move his truck moments after Jeter first asked that it be moved and well before any emergency vehicles arrived on the scene.

95. Jeter knew that there was no arguable probable cause to arrest Rickerson for misdemeanor obstruction.

96. Jeter knew that Rickerson was justified when he declined to leave Ms. Buchanan's side because Rickerson was actively engaged in rendering emergency aid to her and she was in critical condition.

97. Jeter knew that Rickerson had quickly complied with his request to move the truck by having Ms. Meadows move it for him just moments after Jeter asked him to do so.

98. Jeter arrested Rickerson without probable cause and in retaliation for Rickerson' verbal criticism of Jeter's conduct on the scene.

99. Jeter placed Rickerson in the back of a patrol car and left him there while the Pike County officers completed their investigation.

100. Rickerson, who had a pre-existing injury to his spine, complained that sitting in the patrol car with his hands behind his back was exacerbating hs preexisting injury.

101. Rickerson was eventually transported to the Pike County jail.

102. He was incarcerated for several hours.

103. He was released after paying a bond.

104. Jeter wrote a police report with fabricated statements including: (a) that he heard sirens approaching the scene before he asked about Mr. Rickerson's truck; (b) that Rickerson was not actively engaged in rendering aid to Ms.

Buchanan when he asked him to move his truck; (c) that he walked over to the accident scene, identified himself as a Sergeant in the Georgia State Patrol and tried to explain that he didn't want Rickerson's vehicle to be in the way of emergency vehicles approaching the scene; and (d) that Rickerson responded by telling him, "I don't care who you are. You can take me to jail, but I'm not moving my vehicle or leaving this patient right now."

105. Rickerson hired a lawyer to represent him.

106. All charges against Rickerson were eventually dismissed based on the true facts of what transpired.

107. As a direct and proximate cause of the arrest and prosecution, Rickerson incurred economic damages, including, but not limited to, bond money, attorney's fees and costs in his criminal case, and damage to his personal and professional reputation entitling him to an award of economic damages in an amount to be proven at trial.

108. As a direct and proximate cause of the arrest and prosecution, Rickerson suffered physical and emotional injuries, including but not limited to loss of liberty, shame, embarrassment, fear and trauma entitling him to an award of general damages in an amount to be determined by the enlightened conscience of the jury.

109. Jeter acted maliciously, intentionally, and with deliberate indifference for Rickerson's First and Fourth Amendment rights, entitling him to an award of punitive damages in an amount to be determined by the enlightened conscience of a jury.

## COUNT I
## FOURTH AMENDMENT
*False Arrest*

110. Defendant Jeter violated Rickerson's Fourth Amendment rights when he arrested Rickerson without probable cause for crimes he did not commit.

111. Every objectively reasonable officer would have recognized that the facts known to Jeter at the time of his arrest did not support probable cause to arrest him for misdemeanor obstruction.

112. Every objectively reasonable officer would have recognized that the facts known to Jeter conclusively established that Rickerson was justified in remaining with Ms. Buchanan because he was rendering emergency aid to an accident victim who was in critical condition.

113. Pre-existing law gave the Defendants fair warning that arresting Mr. Solon without arguable probable cause violated the Fourth Amendment. *See, e.g.*, *Skop v. City of Atlanta*, 485 F.3d 1130, 1139 (11th Cir. 2007).

114. Pre-existing law gave the Defendants fair warning that turning a "blind eye to evidence suggesting that a suspect is innocent by choosing to ignore information that hs been offered to him or her or by electing not to obtain easily discoverable facts" violated the Fourth Amendment. *See Cozzi v. City of Birmingham*, 892 F.3d 1288 (11th Cir. 2018) (internal punctuation omitted), citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1220, 1233 (11th Cir. 2004)

115. As direct and proximate result of Jeter's actions, Rickerson was seized, incarcerated and subject to prosecution without probable cause in violation of his Fourth Amendment rights, entitling him to actual, compensatory and punitive damages.

## COUNT II
### FIRST AMENDMENT
*Retaliatory Arrest*

116. Defendant Jeter violated Rickerson's First Amendment rights when he arrested Rickerson without probable cause and in retaliation for his legitimate, peaceable criticism of Jeter's actions on the scene.

117. Throughout the incident, Rickerson made statements critical of Jeter including, without limitation: (1) criticizing Jeter's failure to aid in offering emergency care to Ms. Buchanan; (2) criticizing Jeter for his fixation on

Rickerson's decision to remain with his patient and allow Ms. Meadows, who had no medical training move the truck; (3) telling Jeter that he was not interested in his life story; and (4) telling Jeter he was a disgrace to law enforcement.

118. Rickerson made these statements in a calm and peaceable manner that did not disrupt any law enforcement officer, much less Jeter, from their lawful activities.

119. Every objectively reasonable officer under the circumstances confronting Jeter would have known that arresting Rickerson without probable cause and in retaliation for his legitimate, peaceable criticism of law enforcement violated the First Amendment.

120. Under the facts and circumstances alleged herein, pre-existing law gave Jeter fair warning that arresting Rickerson in retaliation for his legitimate, peaceable criticism of law enforcement violated the First Amendment. *See Houston v. Hill*, 482 U.S. 451, 461–63 (1987) (the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *see also Skop v. City*

*of Atlanta*, 485 F.3d 1130, 1139 (11th Cir. 2007) (finding that the idea that a driver's brief inquiry to an officer as to why she should not be allowed to pull into her driveway constituted obstruction "collides head-on with the First Amendment."), *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (supervisor liable if he personally participated in the alleged constitutional violation).

121. As direct and proximate result of Jeter's actions, Rickerson was seized, incarcerated and subject to prosecution without probable cause in violation of his Fourth Amendment rights, entitling him to actual, compensatory and punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court for the following relief:

    a. Hold a trial by jury on all issues so triable;

    b. Award economic, compensatory and punitive damages;

    c. Award Plaintiff attorneys' fees under 42 U.S.C. § 1988;

    d. Tax all costs of this action against the Defendant; and

    e. Award any additional relief that is just and appropriate.

Respectfully Submitted this   25th   day of   September, 2019.

| | |
|---|---|
| */s/ William J. Atkins* | */s/Natalie Woodward* |
| William J. Atkins | Natalie Woodward |
| Georgia Bar No. 027060 | Georgia Bar No. 773827 |
| | |
| **EDMOND, LINDSAY & HOFFLER, LLP** | **SHAMP JORDAN WOODWARD** |
| 344 Woodward Avenue, SE | 1718 Peachtree Street, Suite 660 |
| Atlanta, Georgia 30312 | Atlanta, Georgia 30309 |
| (404) 525-1090 | (404) 893-9400 |
| batkins@edmondfirm.com | woodward@sjwtriallaw.com |